IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 26, 2017 Session

## SHAWN BOUGH v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 107533        Steven W. Sword, Judge**

_____

**No.  E2017-00015-CCA-R3-ECN**
_____

The Petitioner, Shawn Bough, appeals from the Knox County Criminal Court's denial of his petition for a writ of error coram nobis regarding his convictions for felony murder and especially aggravated robbery, for which he is serving an effective life sentence.  The coram nobis court dismissed the petition after a hearing because it determined the newly discovered evidence was not credible and would not have led to a different result at the trial.  On appeal, the Petitioner contends that the court erred by dismissing the petition. We affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Douglas A. Trant, Knoxville, Tennessee, for the appellant, Shawn Bough.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the 1998 shooting death and robbery of Billy Oldham, a hotel desk clerk.  The Tennessee Supreme Court summarized the facts of the case in the appeal of the Petitioner's convictions:

> On December 19, 1998, two sisters, Deanna and Edie Jones, vacated their student housing at Knoxville College for winter break.  They planned to stay the night in Knoxville before catching their flight home to New Jersey the following morning.  They went to the Expo Inn in Knoxville where Edie Jones rented room 207 for the night.  While checking into the

hotel, Deanna Jones saw the defendant, Shawn Bough, and co-defendant, Craig Shears, in the parking lot.  She invited them to come up to their room later on that evening.  Deanna and Edie Jones knew both the defendant and Craig Shears because the two men were also students at Knoxville College.

Montes Best was working at the desk when two African-American men who claimed to be looking for a friend in room 207 approached the locked front doors late at night.  Deanna and Edie Jones remembered the defendant, co-defendant and another male student stopping by room 207 for a few minutes before midnight.  The defendant and Craig Shears stopped by again after midnight, asking to use the telephone.  The defendant used the telephone to call several airlines, attempting to secure a flight from Tennessee through Chicago to California, his home state.  Deanna Jones noticed a gun underneath the corner of the bed where the defendant was sitting.  She told the defendant not to forget his gun; he thanked her and put the gun in his sock.  At that time, the defendant and Craig Shears left the room.

Sometime after midnight, the defendant and Craig Shears returned to room 207 for the third time, again to use the telephone.  Deanna Jones heard the defendant ask the person on the other end of the phone about getting a ride.  The two men left the room after the phone call.  The defendant and Craig Shears came back to room 207 for a fourth and final time to tell Deanna and Edie Jones that they were leaving.  At trial, Deanna Jones testified that it was "still dark" when the two men left the hotel room for the last time.  However, the statement she gave to the police on the day of the incident indicates that the two left the hotel room around 9:00 a.m. on December 20, 1998.  Around 10:00 a.m., Deanna and Edie heard something downstairs in the lobby area that sounded like three or four gunshots.

Dante Smith picked up the defendant and Craig Shears at the Expo Inn shortly after 10:00 a.m. on December 20, 1998, after being called repeatedly by the defendant.  He drove to the hotel where he saw the defendant and Craig Shears running out of the lobby.  The defendant was carrying a plastic tub which contained envelopes.  Dante Smith testified that:

> He [the defendant] was just talking a lot.  He kept on saying something about he thinks he killed—or he thinks he shot somebody inside.  He wasn't sure, but—he said he shot him, but he wasn't sure if he killed him or not.

Mr. Smith drove the two men towards Knoxville College where he stopped the car and asked them to get out because he "had never done anything like this." Mr. Smith then drove back to his apartment.

The defendant and Craig Shears later showed up at Mr. Smith's apartment and started counting money from the plastic container they carried from the hotel. The defendant asked Mr. Smith if he would "hide the gun for him." Mr. Smith refused, asking the defendant if he was "crazy." The defendant also asked Mr. Smith to give the two a ride to the bus stop or airport. Again, Mr. Smith refused.

Just after 10:00 a.m. on December 20, 1998, officers of the Knoxville Police Department were dispatched to the Expo Inn in response to a 9-1-1 call from the hotel's clerk that there had been a robbery and shooting. According to the victim, Billy Oldham, two tall, thin black males from room 207 demanded money and shot him. According to the Knox County Medical Examiner, the victim died as a result of complications from multiple gun shot wounds.

Investigator A.J. Loeffler arrived at the Expo Inn around 10:15 a.m. Almost immediately, he got into the ambulance with the victim. The victim was "gasping for air" and kept saying "I am losing it. I am going out. I am losing it." The victim stated that he "was working the desk, and two guys came in from room 207, asked me for my money, and then shot me." The victim described the perpetrators as "two black males, tall, slender" with "a little bit of facial hair."

After interviewing the victim, Officer Loeffler went back to the Expo Inn. He noted that the telephone lines in the lobby were cut as well as those in the adjacent offices of rooms 105 and 106. The crime scene specialist, Joe Cox, found three .22 caliber long rifle cartridge cases behind the front desk and two cartridge cases located elsewhere in the lobby area. The detail tape on the cash register indicated that the "no-sale" button was pushed at 10:03 a.m. on December 20, 1998.

The defendant called Mr. Smith in January of 1999. He asked Mr. Smith if he talked to the police about the incident. Mr. Smith told the defendant he had not. A few months later, Mr. Smith talked to several detectives regarding his knowledge of the incident.

Isaiah Dixon, a long-time friend of the defendant, saw the defendant in California sometime after the December incident. The defendant told Mr. Dixon that he was on bail for a homicide charge in Tennessee. Mr. Dixon stated that the defendant "told me that he was trying to pull a heist, and there was [sic] things that went wrong. . . . [H]e said the man was taking too long, so he let him have it." The defendant told Mr. Dixon that he got a "couple thousand" in the heist, but that "he had went [sic] to jail shortly after that for like a warrant or something, and when he had got [sic] back to school, all the money wasn't there." At the time of trial, Mr. Dixon was incarcerated in a California prison as a result of a guilty plea for second degree burglary.

The defendant was arrested on May 9, 1999, at his mother's home in San Francisco, California. Officer Loeffler was present during the arrest and recorded a conversation with the defendant later that day. During the conversation, the defendant indicated that he stayed at a hotel with Deanna and Edie the night he vacated the dorms for Christmas break and "left about 9:00 . . . in the morning . . . about 9:30." He stated that "the home boy gave me a ride to Nashville. I took my plane from there." He told Officer Loeffler that the guy who gave him and Craig Shears a ride was named "Ted" and that he drove a van. According to the defendant, "Ted" was a guy who "just come [sic] up to the school, you know . . . he just give [sic] us rides and stuff so I asked him could he give me a ride . . . the night before . . . he said alright, I'll be there." He stated that "Ted" picked him and Craig Shears up at around 9:00 or 9:30 a.m. on December 20, 1998, and took them straight to Nashville where he dropped them off at the airport after making sure their flights were not delayed.

*State v. Bough*, 152 S.W.3d 453, 456-58 (Tenn. 2004).

The Petitioner was convicted of felony murder and especially aggravated robbery, and he was sentenced to concurrent sentences of life and twenty-one years. *Id*. at 459. The Petitioner appealed and, after waiving most of the Petitioner's issues due to an untimely motion for a new trial, this court affirmed the convictions. *State v. Shawn Rafael Bough*, No. E2002-00717-CCA-R3-CD, 2004 WL 50798 (Tenn. Crim. App. Jan. 12, 2004). Our supreme court granted permission to appeal, affirmed the convictions, and, concluding that the motion for a new trial was timely filed, remanded the case to this court for plenary review of all the Petitioner's issues. *Bough*, 152 S.W.3d at 461. On remand, this court again affirmed the convictions. *State v. Shawn Rafael Bough*, No. E2004-02928-CCA-RM-CD, 2005 WL 100842 (Tenn. Crim. App. Jan. 19, 2005), *perm. app. denied* (Tenn. May 23, 2005).

The Petitioner sought post-conviction relief, contending that he received the ineffective assistance of counsel. The post-conviction court denied relief, and this court affirmed. *See Shawn Rafael Bough v. State*, No. E2007-00475-CCA-R3-PC, 2007 WL 3026395 (Tenn. Crim. App. Oct. 18, 2007), *perm. app. denied* (Tenn. Feb. 25, 2008). The Petitioner also sought habeas corpus relief, arguing that the trial court had "constructively amended" the indictment in the jury instructions. The habeas corpus court denied relief, and this court affirmed. *See Shawn Rafael Bough v. Jim Morrow, Warden*, No. E2010-01194-CCA-R3-HC, 2011 WL 2118965 (Tenn. Crim. App. May 24, 2011).

On March 7, 2016, the Petitioner filed a petition for a writ of error coram nobis, arguing that new evidence existed in the form of a sworn affidavit from codefendant[1] Craig Shears. In the affidavit, Mr. Shears stated that he was the "sole perpetrator in the robbery and death of the victim . . . . [The Petitioner] was not present at the time of the crime and had no part in the offense nor shared in any proceeds of it."

At the coram nobis hearing, Craig Shears testified that he presently was imprisoned for the victim's murder. Mr. Shears stated that he robbed and shot the victim and that he acted alone. He agreed that he told the police the Petitioner was with him during the incident and said that he lied because he thought he could "get away with it." He denied that the Petitioner had anything to do with the murder and that the Petitioner was present when the victim was shot.

Mr. Shears testified that he had been with the Petitioner earlier in the day in a hotel room and that the Petitioner left for an unknown destination before the shooting. Mr. Shears stated that he decided to rob the victim, that he did not intend to kill him, that the victim reached for Mr. Shears's gun, and that the gun fired accidentally. Mr. Shears said that after the gun fired, he ran to the other side of the counter and cut the telephone line, looked to determine if anyone else was present, and ran outside. Mr. Shears stated that he saw Dante Smith outside and that Mr. Smith drove Mr. Shears to an apartment complex. Mr. Shears said that he saw the Petitioner again at the apartment complex, that he did not tell the Petitioner or anyone else about the shooting, and that the Petitioner did not participate in, know about, or assist in Mr. Shears's flight from the murder scene.

On cross-examination, Mr. Shears testified that he and the Petitioner drove to Nashville and flew to Chicago together, that they did not discuss the murder, and that after arriving in Chicago, the Petitioner traveled to California. Mr. Shears agreed that Detective Loeffler and Detective Luke interviewed him in Chicago for about thirty minutes and that the detectives did not read Mr. Shears his rights. Mr. Shears agreed that

---

[1] The Petitioner and codefendant Shears were tried separately.

-5-

he initially denied having knowledge of the killing. A recording of Mr. Shears's police interview was played, and Mr. Shears did not recognize his voice on the recording.

Mr. Shears testified that he told the detectives that "Shawn B" shot the victim and that Shawn B had asked Mr. Shears to be a "lookout." He stated that the police did not allow him to speak to his aunt, who was an attorney, although he had spoken to his aunt before the interview. He denied telling his aunt that he killed the victim. He agreed that he and the Petitioner were arrested in Knox County. Mr. Shears denied telling the Petitioner when they were in jail that Mr. Shears shot the victim, and Mr. Shears stated that he did not see the Petitioner in the Knox County Jail. Mr. Shears said that his trial occurred before the Petitioner's trial.

Mr. Shears testified that he did not remember Mr. Smith's testifying at Mr. Shears's trial that the Petitioner called Mr. Smith asking to be picked up and that Mr. Smith saw Mr. Shears and the Petitioner run out of the hotel together. Mr. Shears did not remember Mr. Smith's stating that the Petitioner held a cylindrical container, that the Petitioner and Mr. Shears entered the car, that Mr. Smith saw Mr. Shears and the Petitioner count the money inside the container, and that the Petitioner admitted he shot a person. Mr. Shears said that Mr. Smith only took him to the apartment complex and that the Petitioner was not present. Mr. Shears denied that he and the Petitioner counted the money in the cylindrical container.

Mr. Shears testified that he remembered Ms. Jones testified at his trial, although he did not remember who Ms. Jones said possessed the gun. Mr. Shears did not remember testifying at his trial that he did not rob or kill the victim or plan a robbery. He did not remember identifying the Petitioner as the person who killed the victim, although he later said that he remembered.

Mr. Shears testified that it had been "a while" since he reviewed the transcript from his trial and acknowledged that he had testified under oath at his trial. He said that the version of events to which he testified at his trial was "made up." Mr. Shears did not remember telling the jury about the gun, although he remembered talking about a robbery that took place in a taxi. Mr. Shears did not remember whom he identified as the person who robbed the taxi's driver. He said that he had been at a certain location with a person named "Ace," that they left in a taxi, and that he did not recall a robbery taking place in the taxi. He thought that Ace had a gun, that a robbery occurred, and that he did not see it happen because it occurred behind him. Mr. Shears denied that the Petitioner was present. Mr. Shears did not remember his trial counsel's asking him about the taxi robbery or his response, including his testifying that the Petitioner stood outside the taxi.

Mr. Shears testified that he did not remember stating at his trial that the Petitioner commented that the victim had money and that the Petitioner was going to rob the victim.

-6-

Mr. Shears did not think he made such a statement. He did not remember testifying that he responded to the Petitioner's comment by saying he was not "with that." Mr. Shears did not remember the substance of his testimony at his trial other than that his testimony was consistent with the statement he had given the police. He did not remember stating that the gun belonged to the Petitioner, and he said he owned the gun. Mr. Shears said that he bought the gun from "someone off the street," that he shot the victim about four times, that the victim stood behind a counter in front of Mr. Shears, and that Mr. Shears panicked after the shooting and cut the telephone lines. Mr. Shears stated that he took some money, that he got into a car, that he went to an apartment complex, and that he went in a bathroom and counted the money. He said that he threw the gun down. Mr. Shears stated that he met the Petitioner at the apartment complex, that the Petitioner was with a woman at the apartment complex, and that Mr. Shears did not know if the Petitioner was staying at the apartment complex.

Mr. Shears testified that a detective told him that he could leave if he told them what they wanted to know and that he "would have said anything to go home." Mr. Shears said that he "made up something." Mr. Shears agreed that he drew a diagram depicting the position of the victim and the Petitioner during the shooting, although he said that the diagram did not reflect what happened. Mr. Shears stated that his trial counsel told him to give "the testimony from my statement that was made to the detectives" and that he lied under oath at his trial.

Mr. Shears testified that he remembered "them" playing a recording at his trial and that he did not remember if the recording was the victim's 9-1-1 call. He did not remember the victim's saying during the call that "two African[-]American guys up in room 207 did this." Mr. Shears noted that his trial occurred fifteen or sixteen years before the coram nobis hearing. Upon examination by the coram nobis court, Mr. Shears said that he recalled listening to the recording of the 9-1-1 call at some point but that he did not remember the victim's identifying the perpetrators as two African-American men. Mr. Shears reiterated that no one else was present when he shot the victim.

Mr. Shears testified that he initially did not want to testify at the Petitioner's trial. He denied changing his mind about testifying after hearing the recording of the 9-1-1 call and telling the trial court that he was afraid for his safety if he testified. He denied being afraid of anyone. Mr. Shears said that he filed a post-conviction petition and testified at the evidentiary hearing. He agreed that his testimony was given under oath, although he did not remember the substance of his testimony. He agreed that he told the post-conviction court the Petitioner was the shooter but that this was a lie. He said he told the Petitioner that he knew the Petitioner was innocent about one and one-half years before the coram nobis hearing. Mr. Shears stated that he and the Petitioner were incarcerated in different facilities, that Mr. Shears wrote the Petitioner a letter, and that Mr. Shears apologized and told the Petitioner he would sign an affidavit stating that Mr. Shears

killed the victim. Mr. Shears said that someone at the prison helped him prepare an affidavit about five or six months after he sent the letter and that he mailed it to the Petitioner.

Upon examination by the coram nobis court, Mr. Shears testified that he and the Petitioner left for Nashville the day of the murder, that they flew to Chicago, and that the Petitioner spent a couple of days in Chicago with Mr. Shears before the Petitioner's flight to California. Mr. Shears stated that he lived in Chicago, that the Petitioner lived in California, that he reserved his and the Petitioner's plane tickets by telephone the night before the murder, that the murder occurred the following morning, and that the flight to Chicago departed Nashville in the evening. Mr. Shears said that he paid cash for the tickets and that he and the Petitioner had been in Knoxville for three or four months before the murder. Coram nobis counsel stated that Mr. Shears and the Petitioner had been in Job Corps together.

The transcripts from Mr. Shears's and the Petitioner's trials, as well as the transcript from Mr. Shears's post-conviction hearing, were received as exhibits.

The coram nobis court denied relief. The court found that Mr. Shears was not credible, that he was "quite evasive" during the coram nobis hearing, and that Mr. Shears could not recall his own testimony at his trial or his stating at the Petitioner's trial that he feared "repercussions" if he testified against the Petitioner. The court stated that after "being cautioned by the court" about his testimony, Mr. Shears's memory "appeared to improve somewhat," although the court noted that his testimony "remained less than credible." The court found that Mr. Shears admitted lying under oath in previous proceedings, that Mr. Shears did not tell anyone the Petitioner was not involved in the shooting until one and one-half years before the coram nobis hearing, and that Mr. Shears admitting leaving Tennessee on the day of the murder after paying cash for airplane tickets. The court stated that the transcript from the Petitioner's trial reflected that multiple witnesses placed Mr. Shears and the Petitioner together at the time of the shooting and afterward, which contradicted Mr. Shears's testimony at the coram nobis hearing. The court also noted the victim's "dying declaration" that two black males from room 207 shot him and witness testimony that the Petitioner admitted to shooting someone during a robbery.

The coram nobis court found that Mr. Shears's proffered testimony

> would be in complete contradiction of virtually all other evidence during the trial, including physical evidence. Most notably, such testimony would have been completely contradictory to Mr. Shears' own testimony during his trial approximately seven months prior to the petitioner's trial. At best, the jury would have been confronted with two sets of contradictory sworn

testimony by Mr. Shears.  The other witnesses' testimony would point to a finding that the former testimony is most credible.  The jury would have likely found Mr. Shears to be as incredible as this court does.

The court concluded that the "alleged newly discovered evidence . . . would not have made a difference in the outcome of the trial" and dismissed the petition.  The Petitioner appealed.

A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." T.C.A. § 40-26-105(b) (2012); *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995); *see Cole v. State*, 589 S.W.2d 941 (Tenn. Crim. App. 1979).  The purpose of a coram nobis proceeding "is to bring to the attention of the court some fact unknown to the court, which if known would have resulted in a different judgment." *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1966).

Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner establishes that he or she was "without fault in failing to present the evidence at the proper time." *Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003).  In a coram nobis proceeding, the trial court first must consider the newly discovered evidence and be "reasonably well satisfied with its veracity." *State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007).  If the defendant is without fault because the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial court must examine both the evidence presented at the trial and during the coram nobis proceedings to determine whether the new evidence may have led to a different result. *Id.*  The decision to grant or deny such a writ rests within the sound discretion of the court. *Jones v. State*, 519 S.W.2d 398, 400 (Tenn. Crim. App. 1974); *see Teague v. State*, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988).

# I

## Standard to Deny the Petition

The Petitioner contends that the coram nobis court erred by using an incorrect standard to deny his petition.  He argues that the court stated in its order that Mr. Shears's recantation "would not have made a difference in the outcome of the trial" and that the court should have determined whether the new evidence "may have led to a different result."  The State responds that the two standards are the same, that even if the court's phrasing were improper, the court was not satisfied as to the veracity of the evidence and that remanding for a new hearing is not necessary.

In *Vasques*, our supreme court discussed three findings a coram nobis court must make to grant a new trial on the basis of newly discovered evidence:

> [We] hold that in a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may have* led to a different result. In the Court of Criminal Appeals opinion in this case, Judge Joseph M. Tipton described the analysis as follows: "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different."

*Vasques*, 221 S.W.3d at 527.

As the State correctly observes, the coram nobis court's finding relative to the first prong of the *Vasques* inquiry was that Mr. Shear's testimony was not credible, indicating that it was not "reasonably well satisfied" with the veracity of the newly discovered evidence. *See Vasques*, 221 S.W.3d at 527. At the hearing, the court admonished Mr. Shears to "be straight up with us" and not to avoid answering questions by claiming he did not remember because "that's going to hurt your credibility, and it's going to hurt [the Petitioner], who I'm assuming you're here to try to help." The court characterized Mr. Shears as "quite evasive" and highlighted his purported lack of memory of relevant events during his and the Petitioner's trials. The court found that Mr. Shears admitted lying under oath in previous proceedings and that Mr. Shears's proffered testimony would contradict all the other evidence, including the physical evidence, the victim's dying declaration that he was shot by two men from room 207, and witness testimony.

In any event, the court's statement in its order was not a misstatement of the standard for denying a petition, but rather a conclusion that the proffered newly discovered evidence would not have led to a different result because the evidence would not have been credited by a jury. The Petitioner is not entitled to relief on this basis.

Furthermore, because the coram nobis court discredited Mr. Shears's testimony and was unsatisfied with the veracity of the newly discovered evidence, the court did not abuse its discretion by denying the petition. The Petitioner is not entitled to relief on this basis.

## II

## 9-1-1 Recording

The Petitioner contends that the coram nobis court erred by permitting the State to impeach Mr. Shears with the 9-1-1 recording of the victim's dying declaration, arguing that the recording constituted inadmissible hearsay, violated the Confrontation Clause, and was unfairly prejudicial pursuant to Tennessee Rule of Evidence 403. The State responds that the recording was not admitted during the hearing, that the Petitioner only objected to the recording on the basis of hearsay, and that the prosecutor's references to the contents of the recording were not offered for the truth of the matter asserted.

At the hearing, the prosecutor asked Mr. Shears a series of questions about the recording of the 9-1-1 call in order to establish his recollection, or lack thereof, of the recording's being played at his trial and the victim's statement that two men from room 207 shot him. The record reflects that the only objection made by coram nobis counsel was on the basis of hearsay, and, therefore, the Petitioner's claims relative to the Confrontation Clause and Rule 403 are waived. *See* T.R.A.P. 36(a); Tenn. R. Evid. 103.

The Petitioner's hearsay claim is without merit. As the State correctly observes, the 9-1-1 recording was not played at the coram nobis hearing. The prosecutor's references to the recording were meant to establish Mr. Shears's knowledge of the victim's statement and to impeach his newfound assertion that he acted alone, not to prove that two men shot the victim. Because the statements were not offered for their truth, the record does not preponderate against the coram nobis court's determination that they were not hearsay and were therefore admissible. The Petitioner is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the coram nobis court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE